Good morning, Your Honors. I've asked to reserve five minutes of my time. I represent the appellant, the plaintiff, and the class. So throughout the class period, what the company and the individual defendants were talking about and notably what investors, and importantly, investors through the analysts that were covering the company, were consistently discussing Everbridge's critical event management suite or the CEM suite. It's non-controversial that that made up approximately two-thirds of its total addressable market. It's not controversial that most of the conversations at these analyst phone calls, a good load of the amount of stuff that was put in their filings, was about the company's acquisitions and their efforts to add technology, add teams, add applications and processes to that CEM platform. And then the questions, of course, that followed were, are you able to integrate those things onto this single platform, which was really one of their points that they used to separate themselves from their peers, that everything was one-stop shopping, everything was on that platform. So these questions of integration were consistent and constant and always linked to the question of are you able to generate organic revenue. So through that lens, we have, and again, the papers, I believe, the court is extensively aware with everything that's been briefed, there's really two major issues. There's two focused areas, one would be the statements about the revenue contribution of the X Matters acquisition, April 6, 2021, and then they doubled down a month later. And then there's a couple of integration statements. I'll take the X Matters first, if you don't mind. So the real issue as to the X Matters contribution statement, as we've briefed, is whether the court below correctly credited really all of the allegations of the complaint, as opposed to effectively a counter-narrative that was presented, and specifically whether the court credited CW1 under the standard that this court has articulated for a couple of decades now under Zucco. Now the court never reached prong two, which, as we addressed in our briefing, would be do the allegations give rise to scienter? I think it's also not controversial that this court has generally recognized that Zucco is used for falsity as well as scienter. And then, of course, prong one, which the judge rejected, is effectively do you credit the confidential witness as someone who would have been in a position to know what it was that she was opining about. So obviously there's 16 CWs. We've briefed it extensively. If that concerns you. Mr. Rogers, could I ask just some clarifying questions about your contentions before us? The answering brief notes that the opening brief contains no argument as to the reliability of CWs 4 through 11. So does that mean that you've forfeited any reliance on those allegations? I mean, if the question is effectively am I conceding or cutting bait on those, I think the nuanced answer would be no. A reading of the complaint indicates that. How much work is nuanced doing in that statement? What's that? I'm sorry? How much work is nuanced doing in that statement? Probably a whole lot.  The CWs 4 through 11 are to some degree corroborative. I really don't want to just try to say cut bait. But I know you're turning to the statements. Just another clarifying question about the pleadings. Section 5 is your list of misleading statements. Defendant's false and misleading statements, you catalog them there. There are other statements in the complaint that in passing you also suggest are false and misleading with regard to some other transactions. Again, I think we're going to let nuance do a lot of work there. Okay. I appreciate the clarification. Just to put a little bit of meat on the bones, the judge, as we noted, dismissed in a very sort of, what's the word I'm looking for, sort of a large way. He said a lot of the things are forward looking and put them out. If I may, as I go through the argument today, there are a handful of our statements that I think are strongly within the ambit of what we would call Can we get down to what you consider to be the false statements, the false statements, what they were, and why they're false?  And why they're not forward looking or puffery. I understand that, Your Honor. That's part of the answer. So I'll take them in the two parts. I think first we have the two statements about the X Matters contribution. The first of which is April 6, 2021. That's where Mr. Meredith said Everbridge — no, excuse me, I apologize. That was in an 8K. Everbridge anticipates the partial year contribution to 2021 to revenue. And then the second one was one month later. Where is that in the SEC? That's Paragraph 260 of the complaint. ER 163, I think. But why isn't that just a forward looking prediction? Okay. And there's really two ways that I can answer that. One is, as we put in our papers, we would argue initially that it's not forward looking because it's predependent upon an assumption of the present day. But — and I want to repeat that. I thought we briefed that fairly well. If the court were to say that that statement was forward looking, now we're in safe harbor land under the PSLRA. And as the court knows, it would have to be identified as forward looking. They did identify it as forward looking. It would have to be either accompanied by meaningful cautionary language, or it would need to be made with — not made with knowledge. The not made with knowledge prong, that goes back to what I was saying earlier regarding whether the court would or would not credit Confidential Witness 1. Now Confidential Witness 1 said — now again, the bona fides under Prong 1 is that she was in mergers and acquisitions, had an opportunity to review the underlying metrics of the mergers and acquisitions, that she had spoken on a regular basis to defendants Brickley and to showing that the actual contribution was going to be 20 to 25 versus 9 to 11, as Mr. Meredith — or excuse me, as the company had stated. And importantly, the allegations are also that Mr. Meredith, unlike Mr. Musk in Tesla, did not simply say, oh, I want more optimism, you're out of here. I mean, let's not forget, in Tesla, as Judge Graber knows, Mr. Musk rewarded FE — I believe was two — with being fired for daring to suggest that they weren't going to meet the optimistic outcome. In this case, Mr. Meredith explained to CW1 why they were going to use the 9 to 11 number, was to build in that buffer. But is that the allegation? I don't think your pleading takes us quite that far. The allegation is that according to CW, it mentioned that it was a buffer. It doesn't say who it was spoken to. I mean, where's the personal knowledge in that allegation? Well, again, Your Honor, this is now where it comes back to what we briefed, which is that there has to be a fine line at which the allegations are credited, and at a certain point at which the level of particularity becomes, frankly, unmeetable. We have a — But against the backdrop of CW1, where most of the allegations are these communications are going up the ladder, very scarce in terms of the statements that the defendants are making back down the ladder. And then this key statement of buffering, which is that it's pretty good for you. But there's — is there anywhere in the complaint that suggests that that's based on personal knowledge? There are some very careful phrasing there that seems to ask us to recognize some separation. Well, Your Honor, it was in response to an email attaching a presentation. Now, I'm not going to be able to go beyond the four corners of the complaint. We conducted interviews three years ago. Obviously, if there were certain particularities that were deemed — that were made available in that interview, I would have put it in the complaint. But the idea that this was given in response to the email and the presentation doesn't suggest that it's not firsthand. There's nothing in — I have a further question that troubles me. We say, according to CW1, however, realistically, the forecasts were presenting figures closer to 20 to 25. What's that based on? Is that CW1's own calculations? No. And that's an important distinction that my colleague mentioned in his briefing, and I expect we'll hear more from in a while. But it's an important distinction from Tesla, which I think we can all agree — I know Judge Graber was on the panel — it's the law of the land. Tesla was about a goal that was expected to be met. It was an example where the idea was, why was Mr. Musk's optimism not justifiable in light of what the FEs said? Here it's different. Here we have a presentation. And again, I want to remind the court, there has to be a point in which the allegations in the complaint are accepted as true. The standard is not evidence. We have a witness who is stating that I saw internal metrics. It was part of my job to look at these metrics. I communicated regularly with Mr. Brickley and Mr. Meredith. I sent these metrics via email in the presentation to the defendants. And again, importantly — again, I understand Judge Johnstone's question, and I'm not going to make up facts that aren't in the complaint, but as alleged, the response from Mr. Meredith — and the quotations are not us, the quotations are the witness telling us this — was that Mr. Meredith explained that it was to buffer the appearance of a So the idea that what's underlying or that somehow what's at issue here is whether the underlying metrics of 20 to 25 are at issue, that's for discovery, and I hope the court allows us to get there. And if we don't prove it, I'll be back in front of you with summary judgment and we'll have this discussion again. But I would like to believe that discovery will verify what it says, because what's at issue is not whether that 20 to 25 was correct. It's whether Mr. Meredith was informed of it, which he was, and whether he then explained why he wasn't going to use it. And that's one of the distinctions, again, going back to the broader question of whether this — whether this or some other statements are forward-looking. This is not about the idea that we're going to reach some far-in-the-future goal. It's a matter of you're in possession of documents that suggest that the number you're using is false. And if we take the allegation this is true, that's the knowledge prong. Getting back to — I believe it was Judge Graber's question — the other prong of this safe harbor is whether there's cautionary language. And I'm looking at SER 195, and again, it's boilerplate. It's talking about the ability to match assumptions or match future contributions in the future. There's no language in it that says we may have been mistaken in our underlying assumptions. And this example is going to sound glib, but I'll make it. We're not willing to agree with the analysis of internal metrics that are shown to us. I mean, that's not there. So if I have a moment — I mean, I've reserved some time. I wanted to address the other forward-looking statements. I don't know how the court wants me to handle that. You reserve five minutes. So why don't you reserve it now, and we'll see what the other side has to say about the cautionary language and other requirements that you think should accompany forward-looking statements. Thank you, Your Honors. Good morning, Your Honors. May it please the Court. My name is Ryan Blair from Cooley LLP, and I'm here on behalf of defendants. I'll note that Brianne Carpenter from Everbridge is here with us this morning. Now, there are a host of reasons why this case should be affirmed, all of which are outlined in our answering brief. But as you've noted, at its core, this case boils down to two questions. One, whether the panel can consider CW1's allegation that Everbridge purportedly underreported projected revenue for the acquisition of X Matters under Zucco, and two, whether Everbridge's class period statements regarding its ongoing integration efforts for its acquisitions were false or misleading when made. The answers to both questions are a resounding no, and I'd like to address each in turn before getting to the complete lack of scienter in this case. Now, starting with CW1, plaintiffs in no way established with the requisite particularity CW1's claim that Everbridge intentionally underprojected that its acquisition of X Matters would generate $9 to $11 million versus $20 to $25 million. Now, as you brought up, as a matter of law, CW1's allegations are largely irrelevant because the challenge X Matters projections are quintessential forward-looking statements for an acquisition that had not yet closed. Now, my friend likes to refer to this as a revenue contribution, but what we're talking about are projections into the future, a goal, like the Wachos versus Tesla case. There really is no difference. But CW1's allegations also fail under Zucco for at least three reasons. First, at the most basic level, Zucco's first prong is clear that courts cannot consider CW allegations unless the CW's personal knowledge and reliability are established with particularity. And here, the SAC only alleges CW1's work at Everbridge in the most general of ways, that she was, quote, a member of the finance team, that she held various titles, that she performed work related to Everbridge's M&A process. Such descriptions are so ambiguous as to be nearly meaningless in this case, which is why the district court rightly found those descriptions vague, conclusory, and untethered to plaintiff's claims. Importantly, nowhere in the SAC is it alleged that CW1 was involved in revenue forecasting, preparing financial projections, financial modeling, or how she was otherwise in a position to know the basis underlying Everbridge's projections for X Matters. She could have been involved in budgeting. She could have been involved in SEC reporting. She could have been involved in... Counsel, your colleague on the other side says that those issues are not relevant to the specific assertion that she was told. Our actual projection is thus and such, but we're not going to use it anyway because we want to hide it. We want to use something else. Why would she have to be a revenue forecaster to be able to be accurate or persuasive on that point?  Your Honor, and plaintiffs have made reference to, we're asking for nothing short of evidence. Just answer. If you could answer the question, I'd appreciate it. I will say, in circumstances where there are only CW allegations and no factual information, Zucco makes clear, and this is cited by Glazer, quote, in determining whether the witness in question has personal knowledge of the events they report, the court considers the level of detail provided by the confidential witnesses, the plausibility of the allegations, the number of sources, the reliability of the sources, corroborating facts, and similar indicia of reliability. Okay. That still doesn't answer my question. Why would someone have to have a particular job to be able to say, the boss told me that X is true, but instead I'm going to say Y because I don't want X to be revealed. Why would you have to have a particular job? You were stressing that as being important, but I'm not really sure I understand why. So Your Honor, I think Judge Lee in the Nectar Therapeutics case put it best, that those are the details that is exactly what's demanded. Quote, some specificity to anchor their contentions, that she's right and Everbridge was wrong. And there's nothing there with respect to these projections. And going back to as far back as Silicon Graphics and as recently as the Nectar case, where CW's allegations are premised on internal reports, such allegations must be substantiated with quantifiable details. And what we have here is essentially just CW1 say so. Well, Mr. Blair, I guess I understand both you and your friend are narrowing, maybe narrowing the issues, but we have dismissal of a complaint here that has at least 18 different alleged actionable statements, and they're not all from CW1, and they're not all from other witnesses who the plaintiff is not defending the reliability of. And so, you know, we're still left with some different statements here, and they're not all forward-looking. So maybe if you could turn to Scienter and tell us how much work that does with respect to the allegations as a whole. Absolutely, Your Honor. As the second question, it's really sort of the challenge integration statements that were ongoing during the class period. None of those are false or misleading when made. And part of the reason this is so is because plaintiffs really cherry-pick certain of Everbridge's class period disclosures and then omit other statements within the same exact disclosure that provides the critical context that the court must examine. For example, let's look at Paragraph 236, which does not seem to me to be a forward-looking statement. So that says we've had strong organic growth. We've really integrated NC4 and Risk Center into our entire product offering. It's alleged that those were false statements at the time made. So what's the context that we're supposed to be looking at? So the response to that question was in part an analyst question about what they were projecting forward in terms of revenue. And so... During an earnings call, right? This was an earnings call. That's correct. Okay. That's correct. Which gives it more significance in the context. Not necessarily, Your Honor, but I think the point is there are other statements within that same disclosure. So where... What are the other statements? Sure. So at 2 ER 155, it's still Paragraph 236, we said to expect from NC4. And as we head into 2020. And even setting aside this key context, there are no allegations from February 2020 to specifically infer... Well, you're... It seems to me you're cherry-picking, too, because you said when you look at what we said to expect in the past, you will see that we have had strong organic growth. So I mean, it sort of says we were right because it's already happened. Well, so... I'm not really sure why that helps you. So if you look at CW14's allegations, this is 2 ER 84, Paragraph 25, CW14 stated that NC4 was pulled into Everbridge's products, meaning it was integrated. The same goes for CW16, who talked about integration was improving at the time these statements were made. It also ignores what Everbridge said about the integration of NC4. And I want to specifically refer the Court to 2 SER 430, where the company talks about the successes that it had because of the integration of NC4. Now, that has to be considered in context. And, you know, third, if one were to accept plaintiff's theory that Everbridge's integration efforts were such a failure, one would expect a dramatic fall-off in sales and new customers during the class period. In fact, in their reply brief, Your Honors, plaintiffs contend without factual support that, quote, the failed integrations necessarily impacted Everbridge's operating results. That's reply at 30, Note 14. But the record before the Court tells a dramatically different story. When you're looking at Everbridge's total customer base for its three business segments, that's mass notification, IT alerting, and the CEM platform, their customer base grew from 5,000 to 6,100 during the class period, from the start to finish. And importantly, the CEM platform that they claim was such a failure grew from 100 to 192 customers during the class period. That's a 92% increase. And there's a couple of cases that I think are instructive here. One is Judge McEwen's holding in the Align Tech case, which is 39 F4th at 1099, where she held that positive statements from company executives are not actionable when, at the time they were made, the company's sales of products and issues were still growing. That's what happened here. And, excuse me, Judge Wardlaw, in the Flex Limited case, you know, you held that CW reports of operational problems do not foreclose that Flex experienced some successes on the Nike project. That's what happened here. The record is replete with Everbridge explaining in great detail how the acquisitions at issue helped secure key CEM wins during the class period. And I want to give you these sites in the record. This is 2SER 304 to 05, 2SER 318, which relates to General Mills, 2SER 324, SER 338, 39, which is Twitter. These are all wins that occurred during the class period that new customers on the CEM platform. Mr. Blair, I wonder, with respect to this question about the organic growth strategy, and it strikes me, and I'm not sure you frame the argument quite this way, but the growth is all happening in broad daylight. It's through acquisitions of companies that any investor can see. It's disclosed. So I wonder, and this is intended to be a friendly question, but I'm wondering whether you can just point me to anything. Does that matter where the investor hears that it's an organic growth and then they can see for themselves? These aren't some buried supply chain questions. Obviously, revenue projections are different. But in terms of the strategy, the strategy is playing out in plain sight, is it not? It is, Your Honor. And in fact, Everbridge was adamant about what these acquisitions were doing. Certainly, some of the technology from these acquired companies were incorporated into its products. If you look at X Matters and the statements at issue, you know, one of the things they take out of context is that we say something regarding X Matters has already been integrated. That was specifically related to the IE alerting business segment and not the CEM platform. And so, again, these statements have to be considered in full context of when they were made. When they made that statement, and this is paragraphs 281 and 282 that they talk about they've already been integrated, that was specifically relating to the IT alerting business, not the CEM platform. And not a single CW makes an allegation that that particular aspect wasn't being integrated. Everbridge was very specific about what was integrated and what was continuing to be integrated throughout the class period. And you know, the district court recognized that integration of these types of companies, especially during COVID, is not an instantaneous process. And the company was clear in its cautionary language about potential problems that could happen with the integration process. Do you have a statement? I mean, I was wondering about that because the class period is November 2019 to February 2022, which is really includes the heart of when the country was experiencing COVID. And I'm just wondering if any of that was discussed as a rationale for the ultimate slowdown that occurred. So, Your Honor, with respect to the initial guidance that was issued for 2022, it was still growing at a tremendous rate. It was, you know, 22 to 24 percent. Ultimately, that was lowered later in February of 2022. But there is nothing during the class period to suggest that any individual defendant had any knowledge of the extent of any integration issues. In fact, if they were to look at sales reports, if they were to look at revenue for 2021, they would see that it had grown and that sales and customers had increased. And the only thing that plaintiffs can rely upon is Everbridge Management's comprehensive review conducted after all of the challenge statements were made to support an inference of Scienter, which they attempt to do at page 35. And that is textbook fraud by hindsight pleading, Your Honor. Plaintiffs don't allege that this management review occurred at any point during the class period. And any conclusions that management made in February 2022 cannot relate back to the class period. And I'll close. I know I just have 20 seconds, but I think the Twitter case and Judge Lee really, really makes the point here where the quote is, plaintiffs hitched their wagon on Twitter's August 6, 2019 statement that it recently discovered the issues to leap to the conclusion that it knew about them in July 2019. But nothing in the complaint suggests that the company knew of bugs in July 2019. The same is true here with any purported integration issues. Thank you very much, Your Honor. Thank you very much, counsel. All right. So much to cover, so little time. I'm going to jump into discussions of the integration statement, and I can tell that Judge Johnstone would like to talk about Scienter. Just very briefly, a couple of points raised by my colleague that I want to answer. He pointed to paragraph 25 and seemed to think it was a big deal that CW14 noted that NC was quote-unquote pulled into Everbridge's legacy command center products. For some reason, he left out the following clause, which said, but the technology was still never fully integrated. Nothing more to say on that. Secondly, he mentioned, I believe, that some of the materials were not integrated into the CM, and he was talking about the IS issue. But again, that's just simply not right. On November 9, 2021, Meredith at the earnings call said, we've got, and he said it, but I'm going to plug in the actual subject, we've got the X Matters platform integrated now with our crisis management module, remember that, we've got the X Matters platform integrated with our employee communications module, and we've got the X Matters platform integrated with our visual command center. First of all, not forward-looking, all present. The crisis management module and the visual command center are both key parts of the CEM suite, as shown in that chart in our complaint. So again, I'm not really sure what Mr. Blair was talking about there. Anyway, getting back to the integration statements, and I really hope to get to Sientra at the end of this. As I think Judge Graber noted in her questions, or maybe it was Judge Ward, I apologize, these statements were not forward-looking. I mean, we're not looking at a situation here where they're promising some far-off-in-the-future integration goal, and a la Tesla, they're on track or they're on path towards it. These are current statements about whether they are presently meeting these, and again, I'll think of the language that the Ninth Circuit has consistently used, concrete interim steps, concrete cognizable points along the line. This case is not about some effort to integrate in the future. It's just not. If it was, maybe we wouldn't be having this conversation. It's about, as the panel had noted, questions and statements about what had been done to that point. And I think that also touches briefly on what Mr. Blair said about the management review. Now, if it was purely based upon, our allegations were purely based upon the February 22nd statement that the integration has fallen short, partly because of Mr. Meredith's acquisition plans, again, that might not be enough, but in addition to the corroborative present-day allegations, we're not looking at a la Tesla, where the question is, did Mr. Musk have reason to believe in the interim that they were going to hit the 5,000 car deadline, and then the fact that they didn't hit it is fraught by hindsight. But in this case, we're not talking about meeting steps on the path to some integration goal. It's, did they integrate? And we have CWs all over the complaint that say they didn't. On top of that, we have the management review, which acknowledged that these acquisitions were a mistake and they interfered with our ability to integrate. Not the entire reason we're saying it's false, but one of the reasons. And then my little bit of remaining time, as to the integrate, excuse me, as to SEANTR, I know that Judge Johnson was interested in talking about that, I want to point out two things, which are really not controversial, but I'd like to say them. Everyone knows it's the holistic review, defendants always, and they're just doing their job, they always pick one little silo and one little piece and try to pick it off, but it's the holistic picture. We have confidential witnesses. We have, leave aside core ops for a moment, but just the simple fact that everybody knew, like for instance, if I came here today and I was like, oh my God, I can't imagine they're going to ask me about SEANTR or forward-looking statements, that would have been like for Mr. Meredith and Mr. Brickley to go to these analyst calls and be surprised they were going to talk about integration. So when he spoke, or they both spoke, with utter confidence that every call, we have integrated, we have integrated, that is the definition of reckless, and I'd like to quote, this is the Finisar case, which both Judges Wardlaw and Graber are on, it quotes the Oracle case, which is really quite black-letter law in the Ninth Circuit, an actor is deliberately reckless if he has reasonable grounds to believe material facts existed that were misstated or omitted, but nevertheless fails to obtain and disclose such facts, although he could have done so without extraordinary effort. So Mr. Brickley, Mr. Ellerson, and Mr. Meredith, throughout the class period, talk all the time about whether they have integrated. There's only two possibilities, Your Honors. Either they said we've integrated and they knew they hadn't, or they just didn't bother to go and do their internal due diligence and find out what everybody in the company knew, which was that most of these platforms were not integrated on the CAM platform. I see I'm out of my time. If there's more questions, I can answer, otherwise. I have, never mind. I think I can figure that one out myself. Now, does anyone else have any questions? Thank you very much, Counsel. We previously submitted Curtis v. the Department of the Treasury, and this session of the Court will be adjourned for today. Thank you. All rise. This Court, for this session, stands adjourned.
judges: GRABER, WARDLAW, JOHNSTONE